UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | |
|---|---|
| JOHN COCQUYT, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )   3:19-CV-933-PPS |
| | ) |
| SPARTANNASH COMPANY, *et al.*, | ) |
| | ) |
| Defendants. | ) |

## OPINION AND ORDER

Martin's Super Markets, Inc. was acquired by SpartanNash, and this dispute over the alleged breach of an employment agreement ensued a short while later. The case pits the Plaintiff, John Cocquyt, against his former employer and it relates to whether Cocquyt is entitled to two years severance after his employment with SpartanNash ended. Because I found on summary judgment that Cocquyt's employment agreement was ambiguous, a bench trial was conducted to hear extrinsic evidence to help clarify the ambiguity. After evaluating all of the evidence in this case, I remain convinced that the employment agreement is ambiguous, and the overwhelming extrinsic evidence demonstrates that the intent of both parties who entered into the agreement was to give Cocquyt a severance equal to two years of his salary under these circumstances. Therefore, for the reasons detailed below, I find in favor of Plaintiff, John Cocquyt, and against the Defendants in the amount of $524,000.00 and will enter judgment in that amount.

**Findings of Fact**

Most of the facts in this case are undisputed, and a good chunk of this was already set forth in my opinion and order denying summary judgment dated January 26, 2021. [DE 51.] Before stating my findings of fact, it's worth keeping in mind the basic issue in this case: was Cocquyt owed a severance under the "change in control" provision of his employment agreement with Martin's after Martin's was sold to SpartanNash, and SpartanNash fired Cocquyt within a year of that sale?

With that basic question in mind, here are the facts: Before 2019, Martin's was a supermarket business that was owned by the Bartels family for decades. Prior to selling out to SpartanNash, Rob Bartels was Martin's President and CEO. Bartels and Cocquyt knew one another from church. They weren't close friends, but more like friendly acquaintances. They would see one another from time to time but did not socialize. [Tr. Vol. I, DE 67, at 26.] At the time, Cocquyt worked for Coca-Cola. Cocquyt liked his job at Coke, he was well compensated and he was rising quickly through the organization through several promotions. As a result, when Rob Bartels first asked Cocquyt to join Martin's around 2013 or 2014, he politely declined the offer. But the two kept the lines of communication open. Sometime thereafter, the travel for Coca-Cola started wearing on Cocquyt physically and emotionally, and so when Bartels approached him again in late 2015, Cocquyt was much more receptive to making a move at that time.

After further discussion, Cocquyt decided to make the leap from Coca-Cola to Martin's, but before he did so, he wanted some assurances from Martin's. After all, he

was leaving a good (and secure) job at Coca-Cola. So Bartels and Cocquyt started working on an employment agreement. They engaged in a lengthy negotiation process spanning several months, and involving multiple drafts of a contract for Cocquyt's new position with Martin's. Cocquyt was concerned because he had heard rumors for years that the family-owned Martin's might sell one day. [Tr. Vol. I at 85-86.] Cocquyt testified that he wanted a change in control provision to provide that if, in the future, Martin's was purchased by another company and if that new owner terminated Cocquyt's employment within 12 months of the change of control, he would be paid an amount in severance twice his annual salary. Cocquyt testified credibly that the change in control provision was "[v]ery important to me." [*Id.* at 85.]

After months of negotiations, Bartels and Cocquyt arrived at a final employment agreement. The relevant agreement is set out in Plaintiff's Exhibit 1 which was entered into on August 25, 2016. [Pl.'s Ex. 1.] A few months later it was amended but was still effective August 25, 2016. [Pl.'s Ex. 2.] These are the two documents governing this dispute. The employment agreement provides for "an initial Term" of 3 years, and the agreement "shall be automatically extended from year to year thereafter" unless either Cocquyt or the employer gave Cocquyt notice of an intent not to renew the agreement at least 60 days prior to the end of the initial term. [Pl.'s Ex. 1, ¶ 10.] In other words, the agreement had no expiration date; after the initial three year term, it automatically extended year over year unless either party took the affirmative step of formally terminating the agreement by giving notice to the other party.

3

Paragraph 5 of the employment agreement is the critical provision here at issue. The amendment to Paragraph 5(e) provides that "if, and only if" Cocquyt was terminated within twelve months of a "change of control," he would receive an amount equal to two times his base salary. [Pl.'s Ex. 2, ¶5(e).] Here's the language of the provision in its entirety:

> (5)(e) Change of Control.  ***If, and only if,*** the Employee is terminated within twelve (12) months after a change in control (i.e., change of control meaning substantially all of the Company's assets become owned by persons and/or entities that are not descendants of nor entities controlled by descendants of Robert E. Bartels Sr.,) ***then and in that event*** Employee shall receive from the Company an amount equal to two (2) times Employee's Base Salary in effect for the calendar year immediately preceding the calendar year in which his termination of employment occurs, and Section 5(d) shall be inapplicable.  Such payments are to begin within thirty (30) days of the date of severance and be made over an eighteen (18) month period.

[*Id.*]

The placement of this provision in paragraph five of the contract is the main problem and is what makes it ambiguous. If one reads paragraph 5(e) in isolation, the outcome is clear; Cocquyt gets two years severance if he is fired within 2 years of a change in control. There is nothing ambiguous about this. But the Change of Control provision is not a stand alone provision; instead, it falls under Paragraph 5 of the contract. Here's what it says: "**Termination; Rights on Termination**. Employee's employment *may* be terminated in one of the following ways, *prior to the expiration of the Full-Time Term*:". [Pl.'s Ex. 1, ¶ 5 (emphasis added).] Under paragraph 5, there are six enumerated ways an employee's employment may be terminated prior to the

4

expiration of the Full-Time Term: (a) by death, (b) disability, (c) termination by the company for cause, (d) termination without cause, (e) change of control, and (f) employee resignation or self-termination. [*Id.*] The question becomes whether the "Change in Control" provision of paragraph 5(e) only applies "prior to the expiration of the Full-Time Term" or whether by virtue of the language "if and only if " the parties were intending to carve out termination after a change of control and treat it differently. This is the ambiguity I identified in the summary judgment opinion.

Adding to the ambiguity is the fact that if the contract is read as SpartanNash believes it should be read, then it renders Paragraph 5(d) in the contract basically meaningless. I use the modifier "basically" here intentionally because there is a slight difference between paragraph 5(d) and 5(e) if the contract is read the way SpartanNash wants it to be read. Section (5)(d) establishes that Cocquyt would get two years of severance if he was terminated without cause. Here's what it says:

> *Without cause.* At any time after the commencement of employment, the Company may, without cause, terminate the Term and Employee's employment, effective thirty (30) days after written notice is provided to the Employee. Should Employee be terminated by the Company without cause, subject to Section 5(g) below, Employee shall receive from the Company the base salary at the rate then in effect for twenty-four (24) months from the date of termination. Such payments shall begin within thirty (30) days of Employee's severance and will be made over a twenty-four (24) month period in twenty-four (24) equal monthly payments.

[Pl.'s Ex. 2, ¶ 5(d).] So the only difference between section 5(e) (the change of control provision) and 5(d) (the termination without cause provision) is the change of control provision has an accelerated payout over 18 months (versus the without cause

5

provision that has the same total payout over a longer 24 months). If SpartanNash's interpretation is right, then one would have to believe that Cocquyt negotiated hard for a change of control provision (section 5(e)) that was actually less favorable than the termination without cause provision (section 5(d)). In other words, under section 5(d) Cocquyt would start getting his severance right away and it would be paid to him monthly in equal payments. But under section 5(e)—the change of control provision that Cocquyt fought so hard for—SpartanNash could pay Cocquyt one dollar after thirty days and then wait 18 months to pay him the balance. That doesn't seem like a very sensible way to read the contract.

Anyway, given the ambiguity in the agreement, extrinsic evidence was needed to clear the matter up. In evaluating the extrinsic evidence, it is important to review what Cocquyt was attempting to achieve at the time of negotiations, and why he thought the change in control provision was essential. First, he credibly testified that the change in control provision was critical to him because if the company was sold and Bartels was no longer around, the change in control provision would be activated, and that would give Cocquyt a year to prove himself to the new owners, as well as to make sure that he gelled with the new company and was happy there. [Tr. Vol. I at 88.] And this would have been important to Cocquyt no matter when the change in control were to occur. Second, Cocquyt said if a new company fired him quickly, he might look like a job jumper, and he also recognized it was easier to find a new job if he was still gainfully employed. [*Id.* at 89.]

6

Recall that Cocquyt's contract was negotiated prior to the sale of Martin's to SpartanNash. So it was Bartels who negotiated the contract on behalf of Martin's. And Bartels had the exact same understanding of the change of control provision as Cocquyt did. He too testified credibly that "the change in control language was designed to be a protection . . . upon a change of control the clock started running on a 12-month period that allowed [Cocquyt] to work within the organization and the organization to get to know him, the acquiring party, whoever that might have been, and provided protection upon termination that gave him severance." [*Id.* at 29-30.] Bartels insisted that he thought the language clearly stated that Cocquyt would get the payout if the new company fired him within 12 months, regardless of when that occurred. [*Id.* at 30-31.] Bartels was visibly confused when Defendants' counsel questioned him on cross-examination, for a while not grasping what the confusion was; he viewed the contract as being clear on its face that Cocquyt would get one year to prove himself after a change of control—period. [*Id.* at 57-59.] Indeed, Bartels told representatives of SpartanNash that this was the understanding of the parties—that Cocquyt was plainly owed two years severance under the terms of the agreement. [Pl.'s Ex. 3.] Bartels viewed SpartanNash's interpretation of the contract as "total BS", that SpartanNash "knew it & must know it" and that they were acting in "[b]ad faith." [Pl.'s Ex. 3].

When I finally directed Bartels' attention to the prefatory language of section 5 (which states the employment may be terminated in one of these ways "prior to the expiration of the full-time term"), and brought his attention to the fact that the change

7

of control provision is under this language in the contract, but in this case, the issue is whether Cocquyt is entitled to the change in control payment *even though the initial term expired*, he audibly gasped in court, and finally said, "okay. I see the awkwardness." [Tr. Vol. I at 72.] It was clear to me that Bartels had a sudden epiphany on the stand recognizing the ambiguity that caused this whole kerfuffle. At bottom, I asked him what was his intent as it related to the Change in Control provision, and he said, maybe that paragraph "should have been in its own hole . . . [w]e carved this out. This modified the rest of that section . . . it said - - to me . . . if there's a change of control, and John is terminated within 12 months, severance is his." [*Id.* at 72-73.] But Bartels was very clear that the intent of the parties was that it didn't matter whether the contract was renewed or not, if Cocquyt was fired within 12 months of a change in control, he deserved the payment. [*Id.* at 73-74.]

As I mentioned before, there was a lengthy negotiation process leading up to the final agreement, which involved creating multiple drafts of the employment agreement. Prior drafts show that the change in control provision was previously part of paragraph (d) (termination without cause) and contained language stating "notwithstanding the foregoing," but the change in control provision was changed in the final version to its own paragraph (e) starting with the phrase "if and only if." [Defs.' Exs. B at 4, C at 4, D at 4; Pl.'s Ex. 2.]

After hashing out the contractual language, Cocquyt quit his job at Coca-Cola, and his employment with Martin's started on August 29, 2016. Two years went by

8

without incident. But leading up to the holidays of 2018, Cocquyt's fear that Martin's might be sold became very real. Martin's began negotiations with SpartanNash and an extensive due diligence process ensued. Yvonne Trupiano, SpartanNash's head of human resources, described the review process that her company engaged in before officially buying Martin's. Everyone agrees that SpartanNash was aware of Cocquyt's employment agreement prior to the sale—it was unusual, because most of the Martin's employees did not have a contract. [Tr. Vol. I at 228.] Indeed, internal notes from the SpartanNash's due diligence process reflect an understanding that they would owe Cocquyt $524,000 if he were sacked. [Pl.'s' Ex. 4 at 3; Pl.'s Ex 5 at 3]. On December 31, 2018, Martin's sale to SpartanNash closed.

For a while, SpartanNash evaluated Cocquyt and several other Martin's employees, trying to determine if they would still be valuable and fit into SpartanNash. But eventually, on June 14, 2019, SpartanNash gave Cocquyt written notice that it would not renew his employment agreement and it was therefore allowing it to expire at the end of the initial three-year term, on August 29, 2019. [Pl.'s Ex. 7.] Ms. Trupiano helped prepare that letter. [*Id.* at 235.] From her perspective (as well as SpartanNash), they allowed Cocquyt's initial contract term to expire, properly gave him notice that they were not renewing the contract, did not offer to pay him the double salary change in control severance because that contract was completed, but instead offered to give Cocquyt a 26-week severance pay (approximately $130,000), in accordance with a general severance agreement entered into during the purchase of Martin's. [*Id.* at 219-

9

26.]

  After being presented with the termination letter, Cocquyt e-mailed Ms. Trupiano with several concerns and questions. [Defs.' Ex. G.] In response to his insistence that he was owed the "change in control" severance pay, Ms. Trupiano responded that Cocquyt's employment agreement had expired, so SpartanNash could terminate him without making the change in control payment. [Tr. Vol. I at 224-25.] The two engaged in several communications via e-mail. Ms. Trupiano recognized that there was genuine confusion about the contract which led to a disagreement between the parties on their respective interpretations of the employment agreement. At one point, Ms. Trupiano said "[i]t looks like the confusion is in regard to your Employment Agreement and what happens after it expires" and she explained that SpartanNash's position was that Cocquyt's employment agreement had ended in August 2019, even though she realized the disconnect that Cocquyt still thought he was entitled to the change in control payment. [Pl.'s Ex. 12.]

  Amy McClellan, the current Vice President of fresh merchandising at SpartanNash, worked with Martin's previously and knew both Cocquyt and Bartels. [Tr. Vol. II, DE 68, at 4-6.] She was involved on the Martin's side of things during the due diligence period of SpartanNash purchasing Martin's. Some of Martin's employees received an incentive bonus during the sale. But Cocquyt did not. This was because Bartels told McClellan that Cocquyt didn't need a retention bonus because he was protected by an employment agreement, and SpartanNash would have to honor that

10

agreement. [*Id.* at 9.] Thus, Cocquyt was treated differently relative to the retention bonus because Bartels' intent at the time he negotiated Cocquyt's employment agreement was to give him protection through the "change in control" provision of the employment agreement. In Bartels' mind, that was all the protection Cocquyt needed.

Mark Shamber was the former Executive Vice President and Chief Financial officer at SpartanNash. He was the principal negotiator for SpartanNash during the Martin's sale, and was intricately involved in the due diligence process. Shamber personally visited Cocquyt on April 26, 2019, to give him the separation letter and let Cocquyt know that SpartanNash would not be renewing his contract. [*Id.* at 22-23.] During that meeting, Cocquyt told Shamber that he was entitled to the change in control payment, but Shamber said he disagreed. [*Id.* at 24.] Cocquyt's employment with SpartanNash ended on August 29, 2019, and he was never paid any severance.

## Conclusions of Law

The goal of contract interpretation under Indiana law is to determine the parties' intent. *Tender Loving Care Mgmt., Inc. v. Sherls*, 14 N.E.3d 67, 72 (Ind. Ct. App. 2014); *I.C.C. Protective Coatings, Inc. v. A.E. Staley Mfg. Co.*, 695 N.E.2d 1030, 1034 (Ind. Ct. App. 1998). For this reason, an unambiguous contract "should be given its plain and ordinary meaning." *RLI Ins. Co. v. Conseco, Inc.*, 543 F.3d 384, 390 (7th Cir. 2008). Where the terms of a contract are clear and unambiguous, they are conclusive, and the court will not construe the contract or consider extrinsic evidence. *Eckart v. Davis*, 631 N.E.2d 494, 497 (Ind. Ct. App. 1994). A contract is not ambiguous merely because the parties

11

disagree as to its proper construction. *Vincennes Univ. by the Bd. of Trs. of Vincennes v. Sparks*, 988 N.E.2d 1160, 1165 (Ind. Ct. App. 2013). A contract will be found to be ambiguous only if reasonable persons would differ as to the meaning of its terms or find it susceptible to more than one construction. *Id.*

In looking at a contract, I must read it as a whole—the meaning of a contract is ascertained from considering all of its provisions, not from just looking at individual words, phrases, or paragraphs alone. *Evansville-Vanderburgh Sch. Corp. v. Moll*, 344 N.E.2d 831, 837 (Ind. 1976). Similarly, if it is reasonable, I must accept a construction of a contract that harmonizes all of its provisions (rather than a construction that causes the provisions to conflict). *Four Seasons Mfg., Inc. v. 1001 Coliseum, LLC,* 870 N.E.2d 494, 501 (Ind. Ct. App. 2007). I must "make all attempts to construe the language in a contract so as not to render any words, phrases, or terms ineffective or meaningless." *Allen v. Cedar Real Estate Group, LLP*, 236 F.3d 374, 381 (7th Cir. 2001) (quotation omitted).

Applying these principles, my first task is to determine if the contract is ambiguous. In this case, I continue to believe, as I stated in the summary judgment opinion, that the contractual language in Cocquyt's employment contract is genuinely ambiguous. Reasonable people could interpret this agreement differently—and in fact in this case, they did. On the one side, the "if, and only if" introductory language of section 5(e) can be read to create an exception to the prefatory language establishing that these were all ways of termination prior to expiration of the employment term.

12

Indeed, section 5(e) is the only subpart of Paragraph 5 that uses the introductory statement "if and only if" thus signaling that termination after a change in control was being treated differently from other forms of termination.   Further, in trying to give all the clauses meaning in the contract, if section 5(d) (dealing with termination without cause) granted Cocquyt 24 months salary over a 24 month period of time, that would basically render section 5(e) superfluous because the change in control provision only provides the same payout over an 18 month period of time.  What sense would it make to go through all that effort to put in the change of control provision if it could only be activated prior to the end of the term of the contract, and with the only additional perk of 5(e) over 5(d) being a slightly quicker payout.  I'll return to this point in a moment, because arguably the payout regime in section 5(d) is actually more favorable than the payout in section 5(e) making this reading of the contract even more questionable.

      On the other side, SpartanNash's reading of the contract has some appeal. Section 1 of the contract states "[t]his Agreement may be terminated prior to the end of the Term in the manner provided for in Section 5 below," the beginning of Section 5 also indicates the change of control provision should be activated if Cocquyt was fired "prior to the expiration of the Full-Time Term," and Section 10 dealing with the extension of the agreement contains the phrase "[u]nless earlier terminated pursuant to Paragraph 5," all lending credence to a reading that the change in control provision in 5(e) could only be tripped if the initial term of the contract was still running. [Pl.'s Ex. 1.]

Reasonable people could come to different meanings about this provision, and they did. Ms. Trupiano acknowledged the "confusion" after Cocquyt received his termination letter, and Shamber acknowledged that Cocquyt's reading of the contract was different than his. For his part, Bartels thought SpartanNash's reading of the contract was blatantly opportunistic calling it "total BS." On this point, I especially credit the testimony of Mr. Bartels. He has no axe to grind, no stake in the outcome, and was active in the contract negotiations. He and Cocquyt were acquaintances but not close friends, and I find it hard to imagine he would perjure himself by concocting an interpretation of the agreement for a person he is simply an acquaintance of.

In all events, I find the agreement to be ambiguous, and as the trier of fact in this bench trial, I must ascertain the facts necessary to construe the contract and resolve the ambiguity. *Trs. of Ind. Univ. v. Cohen*, 910 N.E.2d 251, 257 (Ind. Ct. App. 2009). The Indiana Supreme Court stated, "the distinction between patent and latent ambiguities is not useful, and it is proper to admit extrinsic evidence to resolve any ambiguity." *Univ. of S. Indiana Found. v. Baker*, 843 N.E.2d 528, 535 (Ind. 2006). When a contract is ambiguous, extrinsic evidence is permissible to explain the intentions of the parties. *Louis & Karen Metro Family, LLC v. Lawrenceburg Conservancy Dist.*, 616 F.3d 618, 622 (7th Cir. 2010). It is proper to consider negotiations leading up to the final contract, as well as the parties' testimony at trial regarding their intentions. *See, e.g., Michels v. Dyna-Kote Indus., Inc.*, 497 N.E.2d 586, 589 (Ind. Ct. App. 1986) (considering negotiations leading up to the final written contract to help interpret the intent of the parties at the time the

14

contract was formed); *Torres v. Meyer Paving Co.*, 423 N.E.2d 692, 697 (Ind. Ct. App. 1981) (finding the trial court could consider "the situation of the parties, their motives in dealing with each other, and the object sought to be accomplished" in determining the intention of the parties).

In this case, I have no question in my mind that the two parties who drafted the employment contract and amendment—Cocquyt and Bartels—both intended the change in control to be paid to Cocquyt if he was terminated within 12 months after the sale regardless of when this happened in relation to the initial 3 year term of the contract. Bartels was so convinced of his position that it took a while for him to even realize that the contract could possibly be read a different way. And even if one were to look askance at Bartels' trial testimony as just a guy trying to help out a former colleague, that would not explain Bartels' contemporaneous statement excluding Cocquyt from the retention bonus because he was protected by the employment agreement and the change of control provision in it. Recall, that's what Bartels told McClellan when the sale to SpartanNash was occurring, all of which is strong evidence of Bartels' intent.

For his part, Cocquyt was very specific about why the change in control provision was so important to him and how he intended it to be implemented. After all, the fear of the sale of Martin's was the very reason Cocquyt was so insistent on the change of control language in the first place, and it gave him the assurance he was looking for when he made the leap from Coca-Cola. Yet SpartanNash would have me

15

believe that Cocquyt and Bartels went through all of the rigmarole of negotiating the change in control provision that is actually less favorable to Cocquyt than the nearly identical termination without cause provision. (*Compare* Plaintiff's Exhibit 1 section 5(d) *with* section 5(e) in Plaintiff's Exhibit 2.) As I noted above, under section 5(d), Cocquyt was guaranteed a monthly payment in the first month after being terminated and each month thereafter, whereas under section 5(e) the payout was much more at the employer's discretion. In other words, under section 5(e), the employer could pay Cocquyt $1 on day one and then wait 18 months to pay him the balance. Under section 5(d) at least he would collect his two years severance every month. I find it hard to believe that Cocquyt negotiated hard for a change of control provision that was actually less favorable than the termination without cause provision in section 5(d). That reading of the contract is at odds with how people operate in the real world, and it is not sensible.

In sum, Cocquyt's employment agreement is ambiguous, and the extrinsic testimony was overwhelming as to the intent of the parties. He is due two years worth of severance. As such, I find in favor of Cocquyt on the breach of contract claim.

The last issue I have to decide is prejudgment interest. While I may award prejudgment interest as part of a judgment in a breach of contract action, "the crucial factor in determining whether damages in the form of prejudgment interest are allowable is whether the damages were ascertainable in accordance with fixed rules of evidence and accepted standards of valuation." *Thomson v. Ins. Co. of North America*, 11

N.E.3d 982, 1032 (Ind. Ct. App. 2014) (citation omitted). Indeed, "[a]n award of prejudgment interest is proper only where a simple mathematical computation is required. Damages that are the subject of a good faith dispute cannot allow for an award of prejudgment interest." *Id.*; *see also Indiana Indus., Inc. v. Wedge Prods., Inc.*, 430 N.E.2d 419, 427 (Ind. Ct. App. 1982) ("pre-judgment interest is proper where the trier of fact need not exercise its judgment to assess the amount of damages.").

Here, prejudgment interest is not easily determined. As I noted above, the amended employment agreement provides in paragraph 5(e) that change in control payments "equal to two (2) times Employee's Base Salary in effect for the calendar year immediately preceding the calendar year in which his termination of employment occurs . . . are to begin within thirty (30) days of the date of severance and be made over an eighteen (18) month period." [Pl.'s Ex. 2, ¶5(e).] Although Cocquyt indicates in his chart attempting to calculate prejudgment interest that one could *assume* the payments would be made in equal installments [DE 70 at 16-17], that is not what the contractual language provides. Under the plain language, so long as the payments begin within thirty days and are completed by eighteen months, there could be an infinite number of ways the money could be paid out—including all at once in the beginning, or a larger sum at the end. If the parties wanted to ensure equal payments during that time frame, they should have put in specific language like in paragraph 5(d) (termination without cause), which provides that those payments would begin within 30 days of the severance "and will be made over a twenty-four (24) month period in twenty-four (24)

17

equal monthly payments." [*Id.* ¶5(d).] Therefore, the calculation of prejudgment interest cannot be reduced to a simple mathematical formula in this case, and because I find there is too much uncertainty regarding how any prejudgment interest should be calculated, I decline to award it in this case.

## Conclusion

For all of the reasons articulated above, following the bench trial in this case, I find the true intention of both parties who entered into the employment agreement was to give Cocquyt a severance equal to two years of his salary if Martin's was sold and if Cocquyt was thereafter terminated within a year of the change of control (no matter when this termination may have occurred in relation to the full-time term of Cocquyt's employment agreement with Martin's).

Therefore, I find in favor of Plaintiff, John Cocquyt, and against the Defendants, SpartanNash Company and Martin's Super Markets, Inc. n/k/a MSM Holdco, Inc., in the amount of $524,000.00 and enter judgment in that amount. The Clerk is **ORDERED** to **CLOSE** this case.

SO ORDERED.

ENTERED: November 15, 2021.

                                          s/ Philip P. Simon
                                          PHILIP P. SIMON, JUDGE
                                          UNITED STATES DISTRICT COURT